# In the United States Court of Federal Claims

No. 22-1554C
(Filed Under Seal: June 14, 2023)
(Reissued: September 6, 2023)*
**FOR PUBLICATION**

*****************************************
|  |  |
AIR BOREALIS LIMITED | *
PARTNERSHIP, | *
 | *
          Plaintiff, | *
 | *
v. | *
 | *
THE UNITED STATES, | *
 | *
          Defendant, | *
 | *
          and | *
 | *
KENN BOREK AIR LTD., | *
 | *
          Defendant- | *
          Intervenor | *
 | *
*****************************************

*Tyler Dahlin Evans*, Steptoe & Johnson LLP, Washington, D.C., for Plaintiff. With him on briefs were *Caitlin Conroy* and *Joseph McClure*, Steptoe & Johnson LLP, Washington, D.C.

*Amanda L. Tantum*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant, United States. With her were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, Civil Division, *Patricia M. McCarthy*, Director, and *L. Misha Preheim*, Assistant Director, Commercial Litigation Branch, Civil Division,

---

* Pursuant to the protective order in this case, the Court initially filed this opinion under seal on June 14, 2023 and ordered that the parties propose redactions of confidential or proprietary information. After the government and Defendant-Intervenor did so (ECF 53), Plaintiff filed a memorandum arguing that some of the proposed redactions should be rejected (ECF 56). The dispute centers on references to the number and location of aircraft in Defendant-Intervenor's basing plan, information that Defendant-Intervenor considers proprietary, confidential, and important to its business strategy. For the following reasons, I accept the proposed redactions. The Court has incorporated the redactions with bracketed ellipses ("[. . .]") below.

United States Department of Justice, Washington, D.C., as well as *Alissa J. Schrider*, Major, United States Air Force, Trial Attorney, and *Sandy Caruco*, Trial Attorney, Joint Base Andrews, Maryland.

*Mark D. Colley*, Arnold & Porter Kaye Scholer LLP, Washington, D.C., for Defendant-Intervenor. With him on briefs were *Amanda J. Sherwood* and *Julia Swafford*, Arnold & Porter Kaye Scholer LLP, Washington, D.C.

## OPINION AND ORDER

Air Borealis Limited Partnership ("Air Borealis") protests award of a contract to provide airlift support services for the United States Air Force in the Canadian Arctic. *See* Compl. (ECF 1). The successful offeror, Kenn Borek Air Ltd. ("Kenn Borek"), has intervened. *See* Opinion & Order (ECF 32).

The Air Force determined that Air Borealis's proposal was technically unacceptable for several reasons. Air Borealis contends that the Air Force's evaluation rested on unstated evaluation criteria, disparate treatment of the offerors, and procedural errors. The parties have filed cross-motions for judgment on the administrative record, and I have heard oral argument.[1] For the reasons discussed

---

First, Plaintiff — having declined to pursue redactions covering its own basing plan — argues that it would be equitable to disclose Defendant-Intervenor's plan as well. But Plaintiff's proposal was rejected, and Plaintiff has no clear explanation why it has any remaining commercial value. Plaintiff's argument thus amounts to the position that unsuccessful offerors, after losing protests in this Court, can deprive *successful* offerors of confidentiality protections merely by discarding valueless information from their own proposals on the way out the door. Whatever Plaintiff's subjective aims might be, this Court should not adopt a standard that carries such a strong smell of unfair procedural gamesmanship.

Second, Plaintiff argues that the information is necessary to understand the Court's reasoning. I disagree: While the opinion identifies "potential" errors in the evaluation of Plaintiff's and Defendant-Intervenor's aircraft basing plans, it concludes that any errors were harmless because the contract decision had to be upheld for other reasons. No party proposes redactions to the dispositive portions of the Court's analysis, so the redacted material is unnecessary to understand it. In any event, the government and Defendant-Intervenor propose redacting only two numbers in the analysis. The relevant discussion is perfectly intelligible without them.

Third, Plaintiff argues that details of Defendant-Intervenor's aircraft basing plan are already public. The Protective Order does not permit the parties to seal or redact public information. *See* Protective Order ¶ 1 (ECF 9). Sealing public information is always improper. *June Med. Servs., L.L.C. v. Phillips*, 22 F.4th 512, 520 (5th Cir. 2022) ("Publicly available information cannot be sealed.") (collecting cases); *but see, e.g.*, *A.M. v. United States*, No. 21-1157, 2022 WL 6880896, at *2 (Fed. Cl. July 5, 2022). Merely *seeking* to seal publicly available information can be sanctionable. *In re Violation of Rule 28(D)*, 635 F.3d 1352, 1359–60 (Fed. Cir. 2011). But Plaintiff does not actually show what, if anything, is public. At most, Plaintiff shows that it is possible to track aircraft owned by Defendant-Intervenor. But it does not follow that anyone in the general public can use that information to discern how many aircraft, at which locations, Defendant-Intervenor devotes to the contract at issue in this case.

[1] Pl.'s Mot. for J. on the Administrative R. (ECF 30) ("Pl.'s MJAR"); Government's Cross-Mot. for J. on the Administrative R. & Resp. (ECF 40) ("Government's MJAR"); Kenn Borek's Cross-Mot. for J. on

below, Plaintiff's motion is **DENIED** and Defendant's and Defendant-Intervenor's motions are **GRANTED**. The case is **DISMISSED**.

### BACKGROUND

## I. Solicitation

The Air Force provides airlift support for the North Warning System (sometimes abbreviated "NWS") in the Canadian Arctic. Administrative Record at 30 (ECF 16) ("A.R."). The North Warning System is a radar system spread out over five "zones" numbered from west to east as illustrated below. *Id.* at 485, 569.



The Air Force solicited proposals for fixed-wing airlift support services to transport personnel and cargo across the North Warning System. *Id.* at 579. Flights are supposed to originate at logistics support sites designated in each zone. *Id.* at 595. The Air Force expects the contractor to perform the required flights with 90 percent schedule reliability. *Id.* at 580. The successful offeror would have to conduct 2,100-, 3,000-, and 6,000-pound airlifts, on 48 hours' notice, in each of the five operating zones simultaneously. *Id.* at 568–70, 595. This case concerns 3,000-pound airlift services.

---

the Administrative R. & Resp. (ECF 41) ("Kenn Borek's MJAR"); Pl.'s Resp. & Reply (ECF 43) ("Pl.'s R&R"); Kenn Borek's Reply (ECF 44); Government's Reply (ECF 46); Hearing Tr. (ECF 50) ("Tr.").

The solicitation set out two factors for evaluation of proposals: Technical Capability/Risk and Price. *Id.* at 573. The Technical factor — the one at issue in this case — included four subfactors, each organized into one or more "aspects." *Id.* at 571. The following table summarizes the solicitation's factors, subfactors, and aspects.

| FACTOR | SUBFACTOR | ASPECT |
|---|---|---|
| Technical Capability | Subfactor A: Fixed Wing Capacity and Distance Requirements | Aspect 1: Payload Capacity<br><br>Aspect 2: Nautical Mile Requirement |
| | Subfactor B: Managing Aircraft Utilization Across the NWS | Aspect 1: Maximize Performance, Availability, and Responsiveness |
| | Subfactor C: Operations | Aspect 1: Approach to Simultaneous Operations<br><br>Aspect 2: Risk Assessment |
| | Subfactor D: Plans | Aspect 1: Canadian Transportation and Aviation Act Conformation Plan<br><br>Aspect 2: Transition Plan<br><br>Aspect 3: Maintenance Plan |
| Price | | |

The substance of the four subfactors is as follows. Subfactor A, "Fixed Wing Capacity and Distance Requirements," required offerors to provide "a comprehensive plan" for fixed-wing aircraft, across the North Warning System's area, at given capacities and ranges. *Id.* at 568. Subfactor B, "Managing Aircraft Utilization Across the NWS," required offerors to "demonstrate[] innovation in providing resource efficiencies to maximize air asset performance, availability and responsiveness[.]" *Id.* Offerors were "encouraged" to propose "[a]lternative air asset basing plan[s]" that would "increase flexibility and find efficiencies" across zones. *Id.* at 569. Subfactor C, "Operations," required offerors to demonstrate the capability to "provide 3,000 pound lift service to each of the five operating Zones simultaneously," together with sufficient "surge capability (including aircraft and crew) in order to accomplish five simultaneous operations from five different operating locations." *Id.* Subfactor D,

"Plans," required — as most relevant here — an "executable Transition Plan … describ[ing], in detail, how the Contractor will be on-station and able to accomplish missions the first day of the performance period." *Id.*

For each technical subfactor, offerors would receive a "technical rating." *Id.* at 574. The technical ratings for Subfactors A and B (which were considered more important than the other two) would be on a five-level scale from "Outstanding" to "Unacceptable," with "Acceptable" in the middle. *Id.* at 574–75. Subfactors C and D would receive binary technical ratings of "Acceptable" or "Unacceptable." *Id.* at 574.

For Subfactors A and B, offerors would also receive a "technical risk rating" intended to evaluate "the risk associated with the technical approach to meeting the Government's requirements" including "potential for disruption of schedule, increased cost or degradation of performance, the need for increased Government oversight, and/or the likelihood of unsuccessful contract performance[.]" *Id.* at 574, 576–77. Technical risk was evaluated on a four-level scale from "Low" to "Unacceptable." *Id.* at 576–77.

"In order to be eligible for award, offerors [were] required to meet all aspects of the technical subfactors and receive a minimum '[Acceptable]' Technical Rating and 'Low' Technical Risk Rating." *Id.* at 574; *see also id.* ("If an offeror receives an 'Unacceptable' rating in one or more Subfactor, they will be considered unawardable unless discussions are opened."). The solicitation stated that the Air Force intended to award the contract without entering discussions. *Id.* at 572.

The United States Department of Defense's contracts with Canadian suppliers are, with certain exceptions, managed by the Canadian Commercial Corporation ("CCC"), a "Crown corporation" owned by the Canadian government. *See* Defense Federal Acquisition Regulation Supplement ("DFARS") 225.870-1 *et seq.* (codified at 48 C.F.R.); *Canadian Com. Corp. v. United States*, 202 Ct. Cl. 65, 80 (1973). Although bids are submitted to the United States government, the CCC has at least some role in reviewing them — the parties dispute the details. *See, e.g.*, DFARS 225.870-3. The Department of Defense typically awards the contract to CCC, DFARS 225.870-4(a), which in turn subcontracts to the successful offeror and administers the contract, DFARS 225.870-1(c). The Canadian government guarantees performance of contracts awarded to the CCC. DFARS 225.870-1(a). But the successful offeror performs the work. Thus, although payment passes through the CCC, in substance it goes from the Department of Defense to the successful offeror.

## II. **Bidding Process**

Air Borealis and Kenn Borek were the only firms to submit proposals. A.R. at 975. Air Borealis was the incumbent airlift support provider for Zone 5 and Kenn

Borek was the incumbent for the other four zones, both (the government reports) as subcontractors for the CCC. *Id.* at 640, 772, 1543. The relevant aspects of their proposals relate to 3,000-pound airlift services.

Air Borealis proposed to "cover all zones using four (4) aircraft based … in Zones 1, 2, 4, and 5." *Id.* at 657. Zone 3 would ordinarily be covered by an aircraft from Zone 4. *Id.* at 656. Air Borealis explained that it could still conduct five simultaneous missions "upon request" by deploying a fifth aircraft: "When a scheduled 5-aircraft simultaneous operation [was] required," Air Borealis would move one aircraft from Zone 4 to Zone 3 and backfill Zone 4 with a surge aircraft from Zone 5, "bringing the total available aircraft for simultaneous operations to five; one aircraft in each zone." *Id.* at 657. Other parts of the proposal referred to aircraft in Zones 1, 2, 4, and 5 without explicitly locating the fifth aircraft. *See id.* at 662–63. Air Borealis mentioned that it had a sixth aircraft "able to meet the 3,000-pound payload requirement," *id.* at 654, 662–63, but did not detail how it would be deployed.

Kenn Borek's original written proposal is ambiguously drafted and, as counsel conceded at argument, contains misstatements about the proposed number and location of aircraft. *See id.* at 768, 964; Tr. at 111–16. To summarize, Kenn Borek proposed basing aircraft in [. . .] zones. Zone [. . .] would have [. . .] planes year-round and [. . .] at peak season. A.R. at 768; Tr. at 111–12. Zone [. . .] would have [. . .] year-round aircraft and [. . .] during peak season. A.R. at 768; Tr. at 112–13. Zone [. . .] would have [. . .] year-round. A.R. at 768; Tr. at 114–15. Zones [. . .] and [. . .] would be covered by [. . .]. Tr. at 114, 115–16. Kenn Borek thus committed [. . .] aircraft during the offseason and [. . .] during the busy season. Tr. at 111–16. Kenn Borek also submitted a list of [. . .] aircraft in its fleet that it owned "in such a manner as to assure complete control over the aircraft for the performance of this contract." A.R. at 807. The parties dispute whether Kenn Borek's proposal could be read as promising availability of aircraft other than the ones in the basing plan. Pl.'s MJAR at 16; Government's MJAR at 47; Kenn Borek's MJAR at 25–26.

Related to Subfactor D, "Transition Plan," Air Borealis addressed expansion from Zone 5 to the other four zones. Its plan was lengthier than Kenn Borek's, but more generic in some respects. *See* A.R. at 681–82. Air Borealis stated that it would appoint a "program manager" with relevant experience who would organize a "kick-off meeting" to allow everyone to "review," "optimize," "approve," and "understand" its plan. *Id.* at 681. The program manager would then visit all the sites to "discuss the upcoming season," confirm dates, review airfield conditions, and define schedules. *Id.* Air Borealis further stated that "[p]lans have been developed" for hangar space, representing that it "[h]as access" to hangars in some places while other leases would be executed and operations established after award. *Id.* at 682. Air Borealis stated

- 6 -

that it already had sufficient staff, and that equipment "will be procured," aircraft maintenance would be completed, and planes would fly out a week before the start of the season. *Id.*

Kenn Borek's transition plan was designed to address the "delta" between the solicitation and its existing performance as an incumbent: *i.e.*, expansion to Zone 5. *Id.* at 772–73. To that end, Kenn Borek proposed to add another 3,000-pound aircraft in Zone 4 that could be used to cover Zone 5. *Id.* It stated that personnel were already in place, and that while it intended to subcontract for Zone 5, it was capable of handling performance in-house as well. *Id.*

III.  **III.**  <u>**Agency Evaluation**</u>

Kenn Borek received "Acceptable" and "Low Risk" ratings in all four subfactors. *Id.* at 976. Air Borealis received disqualifying evaluation ratings in Subfactors B, C, and D: a "Moderate" risk rating under Subfactor B, and "Unacceptable" technical ratings for Subfactors C and D. *Id.*

For Subfactors B and C, the Source Selection Evaluation Board ("SSEB") concluded that Air Borealis had not adequately established its ability to provide the necessary services across all five zones. *Id.* at 957–59. In its Subfactor B analysis, the SSEB understood Air Borealis to have "propose[d] using one aircraft to fly across two zones and service multiple sites." *Id.* at 957. But the SSEB expressed concern that "[b]asing an aircraft in one zone and requiring it to serve two zones will cause a moderate risk of mission failure" if Air Borealis needed to provide "two simultaneous missions within the 48 hour call up requirement." *Id.* Air Borealis had not "demonstrate[d] a clear plan of how two zones could be serviced within 48 hours should the mission require such operations." *Id.* The SSEB also expressed concern that Air Borealis's plan "would place an undue burden of aircraft positioning cost on the government when simultaneous operations are required." *Id.* The SSEB thus concluded that "[h]aving only one aircraft available puts undue risk on the government of not being able to guarantee missions [sic] requirements[.]" *Id.* The SSEB did not mention Air Borealis's plan to backfill with a fifth aircraft in the event of five-zone operations.

The SSEB's discussion of Subfactor C was similar. The SSEB found that Air Borealis had not met the technical requirements "due to the proposal using one base and one aircraft to service two zones." *Id.* at 958. Because of that aspect of the plan, Air Borealis had not "address[ed] in adequate detail how they would be able to guarantee the availability of simultaneous operations between zones 3 and 4" or "potential aircraft maintenance issues using the adjacent zones basing plan." *Id.* The SSEB did not mention Air Borealis's backfill plan in the Subfactor C analysis either.

The SSEB found that Air Borealis had provided an acceptable, low-risk proposal as to Subfactor A, which related to aircraft capacity and distance requirements. *Id.* at 955. But the SSEB did observe that "[d]uring high usage times of year while conducting operations in each zone, [Air Borealis] could have difficulty in ensuring aircraft availability across the NWS." *Id.* Apparently under the mistaken impression that "[a]ll aircraft" would be "based on the east coast of Canada," the SSEB predicted "long duration flights and high positioning costs to backfill aircraft in most zones." *Id.*

Air Borealis's "Unacceptable" rating for Subfactor D rested on a somewhat different consideration, namely, the SSEB's concern about Air Borealis's transition plan. In the SSEB's view, Air Borealis had "not directly address[ed] how they would be able to base assets outside of zone 5," where Air Borealis was the incumbent: "Several references were made to hang[a]rs and services being made available once the contract was awarded but no specific information was provided as to when and how they would be obtained." *Id.* at 959. Nor did the SSEB find adequate detail "on how [Air Borealis] plan[ned] to populate zones with aircraft, personnel, and the support equipment required to execute the ... basing concept," on "what planning has been done or what has been discussed with outside entities regarding the use of hangar space," or on "what 'access' [Air Borealis] has to hangar facilities of its own at several ... locations outside of zone 5." *Id.* at 960.

Kenn Borek, in contrast, received "acceptable" technical ratings on each subfactor and "low" risk ratings on Subfactors A and B. On Subfactor B, the SSEB concluded that Kenn Borek had "clearly outlined how [it] will manage aircraft across the NWS paying particular attention to the summer work season, which is traditionally the busiest time[.]" *Id.* at 964. The SSEB recognized that Kenn Borek "will utilize a [. . .] base plan and position aircraft in [. . .] on an as needed basis[.]" *Id.* In the SSEB's view, Kenn Borek had "detail[ed]" its plan for callouts and "identified contingency options to support the mission in the event of surge operations or weather impacting cross zone movement of aircraft." *Id.* The SSEB's discussion of Subfactor C used similar language. *Id.* at 965.

Under Subfactor D, "Transition Plan," the SSEB found that Kenn Borek "provide[d] a detailed transition plan to include expanding services into zone 5." *Id.* at 967. The SSEB identified Kenn Borek's potential use of a subcontractor as a weakness, but characterized it as minor because Kenn Borek would be "able to position an aircraft and crew in zone 5 ... should the subcontractor not be able to support[.]" *Id.*

The award process unfolded as follows. The Source Selection Authority decided to "direct contract award" to Kenn Borek on February 15, 2022 and executed a source selection document. *Id.* at 980. On February 23, the Air Force provided the CCC with Kenn Borek's proposal and a "draft award," explaining that Kenn Borek was the "intended awardee." *Id.* at 981, 983.

The Air Force notified Kenn Borek that it was the "apparent successful offeror" on March 3, while cautioning that the award was "pending certified funding" and "subject to endorsement from the Canadian Commercial Corporation." *Id.* at 1173. The Air Force explained that the letter was "not a notice to proceed" and that Kenn Borek would not be "entitled to reimbursement of any costs until an actual award is made." *Id.* The same day, the Air Force notified Air Borealis of the "award decision." *Id.* at 1168–69.

CCC endorsed Kenn Borek's proposal on March 8. *Id.* at 1179. The Air Force then signed an SF 33[2] with an "award date" of March 28. *Id.* at 1229. The CCC's representative signed it afterward. *Id.* at 1324.

Air Borealis's protest with the Government Accountability Office was denied. *Id.* at 1668.[3] This lawsuit followed.

## DISCUSSION

## I. Legal Standards

### A. Jurisdiction

To reach the merits of the case, I must first determine that the Court has jurisdiction over Air Borealis's claims. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). This Court's jurisdiction in bid protests rests on the Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, § 12(a)–(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)); *see Dyonyx, L.P. v. United States*, 83 Fed. Cl. 460, 464–65 (2008). The Tucker Act now grants this Court jurisdiction "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to … the award of a contract or any alleged violation of statute or regulation in connection with a procurement[.]" 28 U.S.C. § 1491(b)(1). Under the Tucker Act this Court has jurisdiction over the subject matter.

---

[2] SF 33, Solicitation, Offer and Award, is a standard form the government uses to officially award contracts. 48 CFR §§ 53.214(c), 15.504.

[3] The parties argue at length about the content and significance of the record developed in the Government Accountability Office protest. I find it unnecessary to reach those disputes because the record of the Air Force contracting process is adequate to support a decision.

Air Borealis must also have standing to challenge the contract award.[4] Air Borealis has Article III standing because it claims an injury — specifically, rejection if its bid and award to Kenn Borek — which is traceable to the allegedly defective procurement process and which could be redressed by this Court. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

Until recently, the Tucker Act's requirement that only an "interested party" could file a bid protest was considered a "threshold jurisdictional issue" too. *See Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002). The Federal Circuit recently clarified that the "interested party" requirement goes only to "statutory standing," and is therefore not jurisdictional in a strict sense. *CACI, Inc.-Fed. v. United States*, 67 F.4th 1145, 1151 (Fed. Cir. 2023) (holding that *Myers Investigative* is abrogated in that respect); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014) (explaining that statutory standing relates not to jurisdiction but to "whether a legislatively conferred cause of action encompasses a particular plaintiff's claim").

When a protestor "challeng[es] the … determination that [the protestor's] own bid had disqualifying deficiencies," statutory standing overlaps with the merits. *CACI,* 67 F.4th at 1152. Nonetheless, "when the plaintiff is arguing that the [government] made an error in evaluating the bid of *another* contractor," a judicial determination of statutory standing is still "required," although it need not be made before reaching the merits. *Id.* (emphasis added).

The Federal Circuit has developed a two-part test for "interested party," requiring that a plaintiff show it (1) is an "actual or prospective bidder," and (2) "possesses the requisite direct economic interest." *Rex Serv. Corp. v. United States,* 448 F.3d 1305, 1307 (Fed. Cir. 2006) (citing *Myers Investigative*, 275 F.3d at 1369 (itself citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992))). There is no dispute that Air Borealis is an actual bidder. Furthermore, neither the government nor Kenn Borek disputes that Air Borealis has a "direct economic interest." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358–59 (Fed. Cir. 2009). A direct economic interest exists if there was a substantial chance that the protestor's proposal "could have been the basis for an award." *Velocity Training, LLC v. United States*, 161 Fed. Cl. 201, 206 (2022). For purposes of statutory standing, the Court need only "mak[e] a preliminary determination … with respect to the plaintiff's chances of securing the contract[.]" *CACI,* 67 F.4th at 1152. If not for the errors Air

---

[4] The government and Kenn Borek argue that Air Borealis lacks standing to raise certain arguments related to the CCC award procedure. *See, e.g.*, Government's MJAR at 20–23; Kenn Borek's Reply at 17. Those arguments are addressed in detail below.

Borealis alleges regarding its proposal, the Air Force would likely have considered Air Borealis's proposal acceptable. Therefore, Air Borealis has a direct economic interest and is an interested party.

## B. Standard of Review

This Court reviews bid protests "pursuant to the standards set forth in section 706 of title 5," *i.e.*, the Administrative Procedure Act. 28 U.S.C. § 1491(b)(4); *see Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004). That standard requires the Court to consider whether the contracting agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial." *Glenn Def. Marine (ASIA), PTE Ltd. v. United State*s, 720 F.3d 901, 907 (Fed. Cir. 2013). There are two bases for setting aside government procurements as arbitrary and capricious: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001); *see also Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005); *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057–58 (Fed. Cir. 2000). Air Borealis alleges that the government both lacked a rational basis and violated applicable regulations. *See* Pl.'s MJAR at 27; 30–35.

The first route involves determining "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Impresa*, 238 F.3d at 1332–33 (quotes omitted) (citing *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)). To succeed in that way, "the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Id.* at 1333 (quotes omitted) (citing *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C. Cir. 1994)). The second route requires the disappointed bidder to "show a clear and prejudicial violation of applicable statutes or regulations." *Id.* (quotes omitted). This Court has denied relief where the violation is not "clear," but merely "colorable." *FirstLine Transp. Sec. v. United States*, 107 Fed. Cl. 189, 205 (2012). In either case, review is "highly deferential" to agency decision-making. *Id.* at 196 (citing *Advanced Data Concepts*, 216 F.3d at 1058).

"Further, in addition to identifying 'a significant error in the procurement process,' a protestor must show 'that the error prejudiced it.'" *Wisconsin Physicians Serv. Ins. Corp. v. United States*, 151 Fed. Cl. 22, 32 (2020) (quoting *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996)). "[T]o establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process,

there was a reasonable likelihood that the protester would have been awarded the contract." *Data Gen. Corp.*, 78 F.3d at 1562.

When a protester challenges the government's determination of the technical acceptability of proposals, the protester bears an "unusually heavy burden of proof in showing that the determination ... was arbitrary and capricious." *Westech Int'l, Inc. v. United States*, 79 Fed. Cl. 272, 286 (2007) (quoting *Cont'l Bus. Enters. v. United States*, 452 F.2d 1016, 1021 (Ct. Cl. 1971)); *see Omega World Travel, Inc. v. United States*, 54 Fed. Cl. 570, 578 (2002) ("It is well settled that contracting officers are given broad discretion with respect to evaluation of technical proposals.").

When resolving motions for judgment on the administrative record under Rule 52.1(c), this Court proceeds "as if it were conducting a trial on the record." *Bannum*, 404 F.3d at 1354 (addressing former RCFC 56.1); *see also Young v. United States*, 497 F. App'x 53, 58–59 (Fed. Cir. 2012).

## II. <u>Merits</u>

Air Borealis's arguments fall into three categories: challenges to (1) the Air Force's evaluation of the parties' transition plans, (2) the Air Force's evaluation of the bidders' plans for covering the five zones of the North Warning System, and (3) the process through which the CCC endorsed Kenn Borek. I address those arguments in turn and conclude that the award to Kenn Borek was not arbitrary or capricious.

### A. Transition Plan

Air Borealis argues that the Air Force erred in concluding that Air Borealis offered a technically unacceptable transition plan. Air Borealis also argues that the award was marred by disparate treatment of the bidders because the Air Force gave inappropriate weight to Kenn Borek's status as an incumbent. I conclude that the Air Force did not act arbitrarily or capriciously.

Although Air Borealis's plan was lengthy, the Air Force reasonably concluded that it lacked specifics. A.R. at 959–61. The solicitation required offerors to "describe[], *in detail*, how the Contractor will be on-station and able to accomplish missions the first day of the performance period." *Id.* at 569 (emphasis added). It called for details such as "workload estimates, priority allocations of personnel and resources, scheduled completion dates of key events, and plans for mitigating risk factors." *Id.* at 589. The Air Force concluded that the Air Borealis plan did "not contain specific information on how the bidder plan[ned] to populate zones with aircraft, personnel and the support equipment required" and failed "to provide what planning ha[d] been done or what ha[d] been discussed with outside entities regarding the use of hang[a]r space." *Id.* at 960.

That conclusion finds sufficient support in the record. Much of Air Borealis's transition proposal rested on generic language with little specific connection to performance — *e.g.*, appointment of a "program manager" with "strong knowledge" of the field, followed by a series of meetings and site visits. *Id.* at 681. The rest was mostly a promise to figure out specifics later. After a "kick-off meeting" (date and location to be determined) to "review, optimize, and approve" a transition plan, the program manager would "seek confirmation of the date that aircraft will be required to be at their respective bases," "review airfield conditions," and "define monthly schedules." *Id.* "[T]ooling and ground support equipment" were to be "procured, if not already in inventory[.]" *Id.* at 682.

Air Borealis proposed that its aircraft would leave for their deployed locations a week before the start of the flying season. *Id.* But where would they be housed on arrival? "Plans have been developed for hang[a]r space," Air Borealis explained, and after award "hangar lease contracts will be executed and … operations stood up." *Id.* Elsewhere in the proposal Air Borealis mentioned that "[p]ermanent facilities are available" in Zones 2, 3 (where it of course did not intend to base aircraft at all), 4, and 5, but not Zone 1. *Id.* at 647. Even assuming Air Borealis meant to refer to those facilities in its transition plan, the plan said little about what the facilities comprised, what services they offered, or even what "available" meant. *Id.* at 647, 681–82. The Air Force reasonably concluded that Air Borealis's plan was not "executable" as written. *Id.* at 569.

Air Borealis argues that the Air Force applied an unstated evaluation criterion by requiring too much detail about its transition plan. Pl.'s MJAR at 27–28. The agency was required to evaluate Air Borealis's proposal based on the criteria in the solicitation; it would have acted improperly if it "used a 'significantly different basis' than the stated factors when evaluating the proposal[.]" *ACC Constr. Co. v. United States*, 122 Fed. Cl. 663, 672 (2015); *see also CACI Field Servs., Inc. v. United States*, 13 Cl. Ct. 718, 728 (1987), *aff'd*, 854 F.2d 464 (Fed. Cir. 1988). But the solicitation required a description, "*in detail*," of how Air Borealis would "be on-station and able to accomplish missions the first day of the performance period." A.R. at 569 (emphasis added). The Air Force simply found that Air Borealis did not provide what the solicitation required. A finding that Air Borealis's vague promises were technically unacceptable applied the solicitation requirements and therefore does not constitute an unstated evaluation criterion.

Separate from the merits of its own proposal, Air Borealis objects to the Air Force's treatment of Kenn Borek's transition plan. It claims the Air Force engaged in disparate treatment when it found Kenn Borek's proposal technically acceptable, and — relatedly — gave Kenn Borek an improper advantage from incumbency.

To prevail on a claim of disparate treatment, "a protestor must show [(1)] that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals," or (2) "that the agency inconsistently applied objective solicitation requirements between it and other offerors." *Off. Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020). Neither condition appears on the record.

Kenn Borek's transition plan committed to continuing performance in Zones 1 through 4 while expanding into Zone 5 by adding another aircraft in Zone 4. A.R. at 772–73. Kenn Borek explained that it already owned the additional aircraft and employed the personnel necessary to operate it, so "no additional provisions or acquisitions are required to meet the new scope of services within the contract." *Id*. While Kenn Borek did mention the possibility of subcontracting missions to Zone 5, it stated that it "is entirely capable of meeting all Zone 5 callout requirements (remotely from Zone 4) … with use of company aircraft identified herein." *Id*. at 773. That level of detail is not "nearly identical" to Air Borealis's transition plan. *Off. Design Grp.*, 951 F.3d at 1372.

Air Borealis claims that the Kenn Borek transition plan omits certain details that the Air Borealis plan contains — for example, information about hangar locations — and specifics about Kenn Borek's prospective subcontractor. Pl.'s MJAR at 28. As to the former, Kenn Borek said exactly where the new aircraft serving Zone 5 would be based: "[Kenn Borek]'s base of operations in Zone 4." A.R. at 773. In other words, no new facilities were necessary for Kenn Borek to cover another zone. Although Air Borealis mentioned "available" facilities in Zones 1–4, *id*. at 647; Pl.'s MJAR at 28, the agency reasonably expected more detail from a plan to service new regions from new locations. Kenn Borek, unlike Air Borealis, did not state the date by which its additional aircraft would be on-site. A.R. at 773. But in the overall context of the evaluation, it was not arbitrary or capricious for the agency to omit discussion of that detail. *See Savantage Fin. Servs., Inc. v. United States*, 158 Fed. Cl. 240, 252 (2022) ("The agency need not provide an 'explicit explanation' as to its reasoning so long as its 'decisional path is reasonably discernible.'") (quoting *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1305 (Fed. Cir. 2021) (itself quoting *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369–70 (Fed. Cir. 1998))).

And as to Kenn Borek's subcontracting plans, the agency *did* consider that a potential weakness in the proposal. A.R. at 967. It just considered the risk a minor one. *Id*. This Court "will not second-guess the [agency's] expertise to assess this risk, which depends on technical judgment." *Blue Origin Fed'n, LLC v. United States*, 157 Fed. Cl. 74, 105–06 (2021); *see also E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) ("[A] court will not second guess" discretionary agency

determinations that "deal with the minutiae of the procurement process in such matters as technical ratings[.]").

Air Borealis also claims that the Air Force gave Kenn Borek too much credit for incumbency, objecting that Kenn Borek did not detail a transition plan for the four zones it was already serving. Pl.'s MJAR at 29–30; Tr. at 10–12. Air Borealis is correct that "being an incumbent alone does not demonstrate capability to perform." Pl.'s MJAR at 29 (quoting *Red Cedar Harmonia, LLC v. United States*, 144 Fed. Cl. 11, 28 (2019), *aff'd*, 840 F. App'x 529 (Fed. Cir. 2020)).[5] But the solicitation did not require a separate transition plan for each individual zone; rather, it required offerors to demonstrate how they would "be on-station and able to accomplish missions the first day of the performance period." A.R. at 569. Kenn Borek stated that it would not need to transition or make changes in the four zones it was already covering and committed to maintaining service on the first day of the performance period. *Id.* at 772–73.[6] Moreover, given that Air Borealis did not provide a transition plan for Zone 5, where it was the incumbent, the Air Force treated the two offerors' incumbency evenhandedly. *See id.* at 977 (finding Air Borealis technically unacceptable under Subfactor D because "transition plan did not address how they would be able to base assets outside of zone 5").

Because the Air Force reasonably determined that Air Borealis had not submitted a technically acceptable transition plan, Air Borealis was properly disqualified from award. *Id.* at 959, 574.

### B. Zone Coverage

Air Borealis contends that the Air Force used unstated evaluation criteria, engaged in disparate treatment, and made factual errors regarding its zone coverage proposal. *See* Pl.'s MJAR at 18–24. While the Air Force's treatment of that aspect of Air Borealis's proposal is questionable, I find that any errors were not prejudicial because Air Borealis was otherwise disqualified from award.

Air Borealis points out that the Air Force made factual errors relevant to evaluation of Subfactors B and C. Air Force evaluators stated — incorrectly — that all of Air Borealis's aircraft would be based on the east coast, A.R. at 955, and that the solicitation "specifies taking off from all 5 [logistics support sites] simultaneously not 4," *id.* at 924; *compare id.* at 623 ("No requirement exists for basing location of

---

[5] At the same time, "the government need not forego the benefits of incumbency in ensuring a level playing field." *ARINC Eng'g Servs., LLC v. United States*, 77 Fed. Cl. 196, 203 (2007).

[6] Air Borealis may also mean to argue that the Air Force made improper assumptions about Ken Borek's performance in the other four zones. Pl.'s MJAR at 11, 29. In fact Kenn Borek described its technical approach as to the other four zones in some detail, just not in the context of the transition plan, which focused on the Zone 5 "delta." *See* A.R. at 772–73.

aircraft," although "offeror[s] need[] to demonstrate the ability to operate in all 5 zones simultaneously[.]"). The Air Force ultimately downgraded Air Borealis's proposal for "[b]asing an aircraft in one zone and requiring it to serve two zones," which the Air Force said would create "a moderate risk of mission failure should the Operations and Maintenance contractor require two simultaneous missions within the 48 hour call up requirement." *Id.* at 957. Those comments, in combination, suggest the Air Force may have misinterpreted the evaluation criteria, applied a basing requirement that was not expressed in the solicitation, or misunderstood Air Borealis's plan for two aircraft to cover Zones 3 and 4 when five-zone operations were required. *Id.* at 657.

The Air Force also may have evaluated Air Borealis's proposal more harshly than Kenn Borek's. Having downgraded Air Borealis's proposal for requiring one aircraft to cover two zones, the SSEB expressed no concern about Kenn Borek's proposal, which called for as few as [. . .] aircraft based in [. . .] zones to meet the 3,000-pound airlift requirement. *Id.* at 962–65.[7]

When the government misinterprets a proposal, its decision may be arbitrary or capricious. *See Data Gen. Corp. v. United States*, 915 F.2d 1544, 1547 (Fed. Cir. 1990) (awarding contract to protestor because government had misinterpreted proposal); *BayFirst Sols., LLC v. United States*, 102 Fed. Cl. 677, 692 (2012) (ratings applied to proposal were arbitrary and capricious because agency misinterpreted proposal). Misinterpreting a solicitation can also be arbitrary or capricious. *Lab'y Corp. of Am. Holdings v. United States*, 116 Fed. Cl. 643, 650 (2014) ("If an agency's evaluation of proposals differs significantly from the process disclosed in the solicitation, the agency's decision lacks a rational basis."); *see also Frawner Corp. v. United States*, 161 Fed. Cl. 420, 445, 447 (2022). That is especially true when the misinterpretation has the effect of adding a criterion that does not appear in the solicitation, *Lab'y Corp.*, 116 Fed. Cl. at 650, or results in disparate treatment, *BayFirst Sols.*, 102 Fed. Cl. at 690.

---

[7] Other arguments Air Borealis raises have less merit. The SSEB expressed concern that Air Borealis's plan would force the Air Force to bear higher costs for aircraft repositioning. A.R. at 955. Air Borealis argues that because "the Solicitation required each offeror to assume that they would meet the not-to-exceed cap on reimbursement of repositioning costs, … concerns about repositioning costs [were] irrelevant for evaluation purposes." Pl.'s MJAR at 27 (citing A.R. at 570–77). Air Borealis is correct that offerors were required to incorporate the maximum reimbursable repositioning cost in their pricing. A.R. at 577. But the Air Force reserved the right to consider "other price factors" and told offerors that the Air Force would "make a subjective evaluation to determine if the offeror's technical approach and proposed price represents the greatest value[.]" *Id.* at 573; *cf. Aero Corp., S.A. v. United States*, 38 Fed. Cl. 739, 765 (1997) (explaining, in the context of a fixed-price contract, that even when "cost overruns … are to be borne by the contractor, [the government] still reasonably may consider risks to performance").

Air Borealis has not proven that the Air Force's potential errors were prejudicial, however, because Air Borealis's transition plan would still be technically unacceptable under Subfactor D. Bid protests are evaluated under the standards of the Administrative Procedure Act, *see* 28 U.S.C. § 1491(b)(4) (incorporating the "standards set forth in section 706 of title 5"), which requires courts to take "due account … of the rule of prejudicial error." 5 U.S.C. § 706. Protestors must show prejudice to prevail on the merits. *Off. Design Grp.*, 951 F.3d at 1373. That requires showing "a substantial chance [the protestor] would have received the contract award but for" the government's error. *Glenn Def. Marine*, 720 F.3d at 912. Even if the Air Force erred in evaluating Subfactors B and C, Air Borealis still would have been ineligible for award because of Subfactor D.

If Air Borealis were right about Subfactors B and C, moreover, its remedy would be a remand to the Air Force for reconsideration. *Thomassee v. United States*, 158 Fed. Cl. 233, 238–39 (2022). Yet Kenn Borek's would still be the only eligible offer — leaving Air Borealis no better off — unless on remand the Air Force considered Kenn Borek's basing plan unacceptable, in which the Air Force would have had to deem *both* offerors ineligible. A.R. at 574. Whether that would happen, needless to say, can only be guessed at.

And even then, would Air Borealis have had a "substantial chance of prevailing" on an offer that was still ineligible for award? *Glenn Def. Marine*, 720 F.3d at 912. The Air Force had already concluded that, in part because of Air Borealis's transition plan in Subfactor D, opening discussions with Air Borealis could not have cured the defects in its proposal. A.R. at 972. If Kenn Borek's proposal was also unacceptable, the Air Force *might* have taken a different view, treated Air Borealis as within the competitive range, and entered discussions with both offerors — but it was not required to. *Id.* at 573 (providing that the Air Force "reserves the right to award without discussions or to establish the competitive range"); *cf. Labat–Anderson, Inc. v. United States*, 42 Fed. Cl. 806, 841 (1999) ("[T]echnically unacceptable proposals must generally be considered to be within the competitive range *if capable of being made technically acceptable and if the proposal's cost or price term is competitive*.") (emphasis added). Or — piling contingency on contingency — the Air Force might have withdrawn the solicitation or amended it in some way, considered revised proposals, and accepted Air Borealis's. All this is to say, because Air Borealis's transition plan disqualified the offer from award, the firm's theory of prejudice amounts only to "conjecture," and is therefore insufficient. *Glenn Def. Marine*, 720 F.3d at 912; *see also Davis Boat Works, Inc. v. United States*, 111 Fed. Cl. 342, 355 (2013).

### C. CCC Endorsement

Air Borealis also challenges CCC's role in the procurement. It argues that regulations directing award of contracts to the CCC violate a provision of the Competition in Contracting Act ("CICA") requiring award of contracts to "*the responsible source whose proposal* is most advantageous to the United States." 10 U.S.C. § 3303(c) (emphasis added); Pl.'s MJAR at 31. CCC did not submit its own proposal or endorse Kenn Borek's before the submission deadline; nor does CCC otherwise stand in Kenn Borek's shoes. Pl.'s MJAR at 31–32. Award to CCC, according to Air Borealis, would thus improperly interpose a third party between the United States government and its contractor. Air Borealis also argues that even if the regulations are valid, the award to CCC in this case did not follow the correct procedure. *Id.* at 32. I find no reversible error.

#### 1. Standing

As a preliminary matter, the government argues that Air Borealis lacks standing to challenge the CCC award procedure. Government's MJAR at 21–23. The government is correct as to the validity of the regulations, but Air Borealis does have standing to challenge the procedure the Air Force followed during the award.

The government argues that Air Borealis lacks standing because the regulations "'[exist] primarily for the benefit of the [g]overnment' not for 'the benefit of the private contractor.'" *Id.* at 23 (quoting *Freightliner Corp. v. Caldera*, 225 F.3d 1361, 1365 (Fed. Cir. 2000)). That is mistaken. Congress has granted this Court jurisdiction when an interested party raises "*any* alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (emphasis added). Given that Air Borealis has Article III and statutory standing, whether it is within the allegedly violated law's zone of interests is irrelevant to the Court's jurisdiction. *WinStar Commc'ns, Inc. v. United States*, 41 Fed. Cl. 748, 756 (1998) ("[T]here is no additional requirement of showing that the procurement statute or regulation at issue was intended to benefit or confer a private right of action upon the protester.").

More fundamentally, the government's authorities requiring that plaintiffs be within a "zone of interest" to have standing predate the Supreme Court's decision in *Lexmark International, Inc. v. Static Control Components, Inc.*, which clarified that the zone-of-interest test goes to whether a plaintiff may invoke a particular cause of action rather than whether a court has jurisdiction. *See* 572 U.S. at 129. The government does not disagree that Air Borealis has a cause of action, so whether Air Borealis is within the CCC regulations' zone of interest has no bearing on jurisdiction.

The government also argues that Air Borealis forfeited its objections to CCC's involvement by failing to file an agency-level protest to the CCC's involvement. The government is correct up to a point: Where a legal flaw is evident on the face of a solicitation, bidders must raise it at the agency "prior to the close of the bidding process" or else "waive[] [their] ability to raise the same objection afterwards in a § 1491(b) action in the Court of Federal Claims." *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1315 (Fed. Cir. 2007); *see also COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1383 (Fed. Cir. 2012).

Here, Air Borealis was on notice all along of CCC's potential role. *See Blue & Gold*, 492 F.3d at 1315; *see also Mlinqs, LLC v. United States*, No. 22-1351, 2023 WL 2366654, at *8 (Fed. Cl. Mar. 6, 2023). The solicitation incorporated by reference DFARS 252.215-7004, which "applies only if award is to the [CCC]." A.R. at 547. Air Borealis contends that reference was insufficient to give it notice because it "does not apply to competitive procurements and only applies to sole-source awards to CCC[.]" Pl.'s R&R at 24 (citing DFARS 215.408(2)(ii)(A)). But DFARS 215.408 also states that DFARS 252.215-7004 should be used "for a competitive acquisition" like the one at issue here.[8]

Furthermore, Air Borealis was already performing a contract in Zone 5 as a subcontractor to CCC. Pl.'s MJAR at 37; A.R. at 640. Air Borealis contended that it was possible the solicitation would fall within an exception to CCC contracting, so the solicitation did not necessarily require award through CCC. Pl.'s R&R at 24; Tr. at 128 (citing DFARS 225.870-1). But if such an exception was possible, it only underscores the "patent ambiguity" about CCC's role, triggering Air Borealis's "duty to seek clarification from the government[.]" *Blue & Gold*, 492 F.3d at 1313. Because Air Borealis "knew of the [government's] 'longstanding policy'" of awarding contracts

---

[8] DFARS 215.408 states that DFARS 252.215-7004 should be used "[i]n a solicitation … for a competitive acquisition … that meets the thresholds specified in paragraph (2)(ii)(A)(1) of this section." Paragraph (2)(ii)(A)(1) relates to cost-reimbursement contracts "if the contract value is expected to exceed $700,000[.]" That provision appears to cover the solicitation.

"[C]ontract types are grouped into two broad categories: fixed-price contracts … and cost-reimbursement contracts." 48 C.F.R. § 16.101(b). "Cost-reimbursement types of contracts provide for payment of allowable incurred costs, to the extent prescribed in the contract." 48 C.F.R. § 16.301-1. "A firm-fixed-price contract," in contrast, "provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract." 48 C.F.R. § 16.202-1.

The solicitation anticipated "award of a Firm Fixed Price with a Cost reimbursable [Contract Line Item Number]." A.R. at 558. The contract at issue is therefore a "cost-plus-fixed-fee" contract, which is a kind of cost-reimbursement contract. *Gen. Dynamics Corp. v. United States*, 47 Fed. Cl. 514, 518 n.1 (2000); *SSA Marine, Inc. v. United States*, 77 Fed. Cl. 662, 666 (2007). The solicitation's cost-reimbursable line items exceeded $700,000. A.R. at 507–512. Because the solicitation could be read as meeting the requirements of DFARS 215.408, the parties should have been aware that DFARS 252.215-7004 — governing award to the CCC — could apply. The parties were therefore on notice of possible award to the CCC, with the offeror as subcontractor.

to Canadian offerors through CCC and did not challenge that process at the agency level or seek clarification from the Air Force, *id.* at 1315, Air Borealis lacks standing to make that challenge now.[9]

Air Borealis has not forfeited its argument that the Air Force failed to follow DFARS regulations. Even if Air Borealis was on notice that the solicitation contemplated an award to CCC, Air Borealis argues that the Air Force violated the regulatory procedures for the award. Pl.'s MJAR at 32. That alleged error occurred after offerors had submitted their proposals and thus was not a "patent error" in the "terms of a government solicitation." *Blue & Gold*, 492 F.3d at 1315. Air Borealis obviously could not have objected to those errors until they occurred. Therefore, Air Borealis has standing to object now.

### 2. Substance

Air Borealis claims that the Air Force violated regulations by accepting CCC's endorsement of Kenn Borek's proposal, and making an award based on that proposal, after deciding on an award to Kenn Borek. Pl.'s R&R at 18. Air Borealis's challenge to the award process fails, however, based on the plain language of the regulation and the communications between the government and the offerors. CCC endorsement of offers submitted directly to the Department of Defense is explicitly allowed by the regulation. *See* DFARS 225.870-3(b). There is thus nothing improper about substituting CCC for Kenn Borek as the responsible source.

To begin with, the Air Force followed the award procedure provided by regulation. DFARS 225.870-3(b) states that "the contracting officer shall receive the Canadian Commercial Corporation's endorsement before contract award." Contrary to Air Borealis's argument, that is what happened here. Although the Air Force notified Kenn Borek that it was the "apparent successful offeror" on March 3, 2022, it made clear that the award would not be made until later. A.R. at 1173. CCC endorsed Kenn Borek's proposal on March 8. *Id.* at 1179. The Air Force completed the formalities of award, such as signing an SF 33, on March 28. *Id.* at 1324; *see also* 48 C.F.R. § 15.504 (providing the requirements for a completed contract).

Air Borealis argues that the March 3 notice of "apparently successful offer" was itself an official offer, but relevant authority points the other way. *See Am. Med.*

---

[9] Although the argument is forfeited, Air Borealis raises a plausible argument that interposition of the CCC between the government and the contractor is unfair to other offerors and "deprives the Government of the benefits and rights that it would otherwise have through direct privity of contract with successful offerors." Pl.'s R&R at 16–17. It is certainly peculiar for the Air Force to adopt regulations allowing a corporation owned by a foreign government to veto proposed contracts. The question whether the relevant statutes authorize the Department of Defense's regulations must await another case.

*Equip., Inc. v. United States*, 160 Fed. Cl. 344, 350 (2022) (differentiating between "notice of award" and an official award document); *Goldberger Foods, Inc. v. United States*, 23 Cl. Ct. 295, 302 (1991), *aff'd*, 960 F.2d 155 (Fed. Cir. 1992) (same). Although the Air Force notified Air Borealis of its "award decision" by letter that same day, *see* A.R. at 1168, there is no reason to hold that the government can make an award to one offeror by making misstatements in communications with another offeror. Even if the Air Force had *intended* to make an award to Kenn Borek that day, it did not complete the process for doing so until later. *Cf. Caddell Constr. Co., LLC v. United States*, 120 Fed. Cl. 724, 726 (2015). The same goes for the Air Force's execution of the source selection document before seeking CCC's endorsement. Pl.'s MJAR at 13; A.R. at 980.

Air Borealis also points to statutory language providing for notice to unsuccessful offerors "within three days after the date of contract award." 10 U.S.C. § 3303(d), *see* Pl.'s R&R at 15. According to Air Borealis, that language precludes notice to unsuccessful offerors *before* award. Tr. at 28, 30–31. Assuming Air Borealis reads the statute correctly, a premature notice to Air Borealis still does not equal an award to Kenn Borek. In any event, the regulations contemplate notice to unsuccessful offerors before an award. *See* 48 C.F.R. § 15.503 ("Within 3 days after the date of contract award, the contracting officer shall provide written notification to each offeror whose proposal was in the competitive range but was not selected for award … *or had not been previously notified*[.]").[10]

Air Borealis relatedly contends that Kenn Borek should have been required to submit certified cost or pricing data because there was no appropriate waiver of such data. Pl.'s MJAR at 13, 34. In lieu of certified data, the CCC certified that Kenn Borek's proposed prices were "fair and reasonable." A.R. at 1180; DFARS 252.215-7004; *see also* A.R. at 1493.

Although certified cost or pricing data is ordinarily required for award of certain contracts, it can be waived "in an exceptional case when the head of the procuring activity … determines that the requirements of this chapter may be waived and justifies in writing the reasons for such determination[.]" 10 U.S.C. § 3703(a)(3). The DFARS explicitly states that the Department of Defense "has waived the requirement for submission of certified cost or pricing data for the Canadian

---

[10] More generally, formulations requiring a particular action "within X days after" a given event are common in United States statutes, court rules, and daily life. Sometimes an action logically cannot take place before the triggering event. ("Please send me a copy of the letter within five days after receipt.") But not always. ("Please upload invoices for travel expenses within a week after your return.") Air Borealis points to no logical or linguistic reason why notice to an unsuccessful offeror depends on an already-executed contract. The statute's plain terms thus place no limit on notice to unsuccessful offerors before award is complete.

Commercial Corporation and its subcontractors[.]" DFARS 215.403-1. That waiver, in turn, appears to have been based on a finding of exceptional circumstances. Department of Defense Acquisition Regulations; Defense Federal Acquisition Regulation Supplement, 56 Fed. Reg. 36280, 36329 (July 31, 1991); Defense Federal Acquisition Regulation Supplement; Contract Pricing and Cost Accounting Standards, 70 Fed. Reg. 75440, 75442 (Dec. 20, 2005). Although the finding is thinly reasoned, Air Borealis presents no argument why it is inadequate. Consistent with the regulatory waiver, the solicitation includes a written determination that "[c]ertified cost or pricing data is not required." A.R. at 570.

Air Borealis seems to argue that a certification like CCC's in this case is only appropriate when the CCC endorses an offer before submission, but points to no regulatory language to support its interpretation. Pl.'s MJAR at 34–35. Air Borealis contends that if the Air Force had communicated with Kenn Borek in the way the CCC did during the endorsement process, it would have been obligated to include Air Borealis. *Id.* at 16. But that merely goes to show that the Air Force and the CCC have different functions and follow different processes. Air Borealis, again, forfeited its objection to the CCC's role by failing to raise it during the bidding process. *Blue & Gold*, 492 F.3d at 1313. Because the Air Force properly awarded the contract to CCC under the applicable regulations, the waivers of certified cost or pricing data apply.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the administrative record is **DENIED** and Defendant's and Defendant-Intervenor's motions are **GRANTED**.

Pursuant to the Court's October 24, 2022, Protective Order (ECF 9), this Opinion has been issued under seal. The transcript of oral argument is under seal as well. The parties shall have two weeks to propose redactions and, accordingly, shall file notice of their proposed redactions no later than **June 28, 2023**. To aid the Court's evaluation of the proposed redactions and in light of the "presumption of public access to judicial records," *Baystate Techs., Inc. v. Bowers*, 283 F. App'x 808, 810 (Fed. Cir. 2008) (per curiam), each party shall file a memorandum explaining why redactions are necessary for each item of information for which a redaction is proposed.

The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Stephen S. Schwartz
STEPHEN S. SCHWARTZ
Judge